**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| DERRICA WILSON,<br><br>Plaintiff,<br><br>v.<br><br>DISTRICT OF COLUMBIA,<br><br>Defendant. | Case No. 17-cv-948 (JMC) |

# MEMORANDUM OPINION & ORDER

Derrica Wilson claims that she was paid less for her work at the D.C. Lottery than were three of her male colleagues who, according to Wilson, performed substantially similar jobs to her. She also claims that, after she complained about her unequal pay, she was retaliated against. The District does not contest that Wilson has made out a prima facie case of wage discrimination under the Equal Pay Act by comparing herself to two of the three employees, and on this record a jury could find that the District has not made out its affirmative defense to justify the pay disparity with those two men. A reasonable jury could likewise find that some, but not all, of the actions that the District took after Wilson complained about discrimination were retaliatory. The Court therefore **GRANTS** the motion for summary judgment in part and **DENIES** it in part.[1]

## I. BACKGROUND

The Court recounts the facts here in the light most favorable to Wilson. The D.C. Lottery is run by a subagency within the District's Office of the Chief Financial Officer. *See*

[1] Unless otherwise indicated, the formatting of citations has been modified throughout this opinion, for example, by omitting internal quotation marks, emphases, citations, and alterations and by altering capitalization. All pincites to documents filed on the docket in this case are to the automatically generated ECF Page ID number that appears at the top of each page.

ECF 50-2 ¶¶ 1–2. Derrica Wilson began working for that subagency in 2010. *See id.* ¶ 16. She was hired to work as an investigator. *See id.* In that role, she "conduct[ed] background checks on new hires" and "contractors," "investigat[ed] customer" and "retailer complaints," and implemented "regulations" that the "security division" was "required" "to uphold." ECF 49-11 at 5; *see also* ECF 50-2 ¶ 17. Wilson's direct supervisor when she was hired was the D.C. Lottery's Chief of Security—Kerry Scott. *See* ECF 50-2 ¶ 18; ECF 49-12 at 6.

Positions within the Office of the Chief Financial Officer are assigned grade and step numbers that correspond with certain salary ranges. Wilson's investigator position was rated as a grade 12, step two position, and she was paid an annual salary of $67,019. *See* ECF 50-2 ¶ 16; ECF 49-10 at 2. Her boss's position, the Chief of Security role, was graded as a 13/14 position. *See* ECF 49-14 at 9 (job posting for Wilson's boss's position at time he applied for role). That grading meant that an employee in the Chief of Security role could become a grade 14 employee even if they began at grade 13. *See* ECF 50-2 ¶ 23 (not disputing this aspect of statement of undisputed facts); *see also* ECF 49-4 at 7. When Wilson's boss Scott was hired into the role, however, he was immediately assigned a grade of 14. *See* ECF 50-2 ¶ 21. That, along with his step rating of 10, put Scott's annual salary at $103,110. *See id.*; *see also* ECF 49-13 at 2.

In the summer of 2011, Scott retired. *See* ECF 50-2 ¶ 24. At the time of his retirement, he was still a grade 14, step 10 employee. *See id.* ¶ 25. His salary had increased to $114,033. *See id.* Within a couple of weeks of Scott's retirement, the Office of the Chief Financial Officer issued a job posting for a role titled "Senior Investigator." ECF 49-16 at 2. Rather than hire another Chief of Security, the Office opted to hire for this new role. *See* ECF 49-11 at 6 (Wilson explaining this change in her deposition). This new role was advertised as a grade 13 position. *See* ECF 49-16 at 2; ECF 49-20 at 2.

The day after the Office published the job description for this new Senior Investigator role, it temporarily detailed Wilson into the position. *See* ECF 49-17 at 2; ECF 50-2 ¶ 29. When it did so, the Office also increased Wilson from a grade 12, step two employee to a grade 13, step one employee and bumped her salary up to $74,888. *See* ECF 49-17 at 2. Eleven days later, Wilson applied for the Senior Investigator role, seeking to make her temporary appointment permanent. *See* ECF 49-18 at 2. About a month later, Wilson was offered and accepted the position. *See* ECF 49-21 at 2. Her pay bump became permanent at that point, too: grade 13, step one, earning $74,888 annually. *See* ECF 49-19 at 2.

Approximately two-and-a-half years later, around early 2014, Wilson's manager submitted a request to human resources to either "recruit for a Chief Investigator at a higher grade-level[] or upgrade the existing Senior Investigator position"—the one Wilson held. ECF 49-22 at 2; *see also* ECF 49-2 ¶ 34. Human resources denied that request. *See* ECF 49-22 at 2. It did, however, tell Wilson's manager that she could change the "organizational title" of the Senior Investigator role to "Chief Investigator." *Id.* That sort of change—assigning an organizational title—was made within the Office at times to "better" "line[] up" an employee's title with their work, perhaps in cases where the employee "need[s] to meet with the public" or otherwise requires a "more specific title." ECF 49-4 at 17–18. Human resources also informed Wilson's manager that, "regardless of title," the "existing position description" for the Senior Investigator would "need to [be] revise[d]" to "reflect accurately the current duties of the position." ECF 49-22 at 2. The Office did then change the "organizational title" of Wilson's position to "Chief Investigator" and issued an updated job description. ECF 50-2 ¶ 39; *see also* ECF 49-24; ECF 49-25. The Office did not, however, change Wilson's grade rating. She remained at grade 13, *see* ECF 49-24, with no increase in pay.

In August 2016, Wilson's job changed again. That month, the Office created a new position titled "Chief, Compliance and Enforcement." ECF 49-39 at 2. That position was also designated as a grade 13 role. *See id.* Wilson's supervisor then told her at a meeting at the end of the month that she was being reassigned to this new role. *See* ECF 50-17 (meeting invitation); ECF 49-12 at 9–10; ECF 49-11 at 13. As part of this new role, Wilson was tasked with "provid[ing] supervisory direction . . . in the execution and enforcement of all licensing requirements and charitable games licensing programs." ECF 49-39 at 3. These responsibilities related to the supervision of retailers licensed to sell lottery products. *See* ECF 49-11 at 12.

A different employee—Jeffrey Anderson—had previously served as the "Chief of Charitable Games & Licensing." ECF 49-28. Anderson retired in late 2015, and in preparation for his retirement the Office made plans to "combine[]" his position with Wilson's Chief Investigator position. ECF 49-31 at 4. When Wilson was appointed as the newly created Chief of Compliance and Enforcement, the Office saw that plan through. *See* ECF 49-33 at 2 (document describing Wilson's new role discusses her "acquisition of the Licensing Unit"). And by transferring the licensing functions from the now-retired Anderson to Wilson, the Office also lessened the load of another employee. Anderson's former manager—Stephen Galaydick—was the Director of Sales and, prior to Wilson's assignment to the new job, the "charitable games and licensing" responsibilities had rolled up to Galaydick. ECF 49-12 at 7. Galaydick had "consistently complained . . . about having to manage the Charitable Games & Licensing Division," and when Wilson took it on, it was "removed from [Galaydick] even though he was hired to manage it." ECF 50-10 at 3.

Despite taking on these responsibilities from Anderson and Galaydick, Wilson remained a grade 13 employee and received no raise. *See* ECF 50-2 ¶ 67. Anderson and Galaydick, however,

were both at higher grades. When Anderson retired, he was at grade 14, step 10, earning $129,592. *See id.* ¶ 49. Galaydick was hired as a grade 15, step one employee, earning $114,677. *See id.* ¶ 43.

Wilson's pay disparity with Anderson and Galaydick, as well as with Scott—the former Chief of Security who Wilson replaced after his retirement—prompted her to complain to the Office about her treatment. In September 2016, an attorney representing Wilson sent the Office a letter outlining her potential legal claims and proposing a settlement. *See* ECF 49-40. This was not, however, the first time that Wilson brought concerns about her pay to the Office. In meetings in 2013 and 2014, Wilson complained that she was "receiving unequal pay" as compared to Scott and requested a grade increase to 14. ECF 50-6 at 19–22. And in June 2016, Wilson requested a pay increase because of the "additional duties" she took on in "managing" the licensing and charitable games department. ECF 50-18 at 2.

Wilson alleges that, after her complaints in 2016, the Office retaliated against her. She identifies several meetings that she says she was excluded from in 2016 and 2017. *See* ECF 50-2 ¶¶ 70–71, 75, 79, 81, 88, 93. She also points to her removal from an "executive committee e-mail list," ECF 50-4 at 46, her supervisors' failure to meet with her to provide feedback on her annual review, *see* ECF 50-7 at 13, and the denial of "necessary training," ECF 50-1 at 9. Finally, Wilson complains about an incident where her supervisor emailed Wilson's individual performance plan to a group of the D.C. Lottery's vendors. *See* ECF 50-2 ¶ 96.

Because Wilson believed she was being paid less than her male colleagues despite performing equal work, and because she believed she was retaliated against after complaining about that pay disparity, she filed a charge of discrimination with the D.C. Office of Human Rights. *See* ECF 49-48. That charge was cross-filed with the Equal Employment Opportunity Commission, which then issued Wilson a right-to-sue notice in January 2018. *See*

ECF 50-2 ¶¶ 86–87; ECF 49-62 at 2. Wilson had already filed this lawsuit by that point, *see* ECF 1, but—with both sides' agreement—she filed an amended complaint after issuance of the right-to-sue notice, *see* ECF 13; ECF 14. After discovery, the District moved for summary judgment. *See* ECF 49. The Court now resolves that motion.

## II. LEGAL STANDARD

The Court will grant a motion for summary judgment only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In evaluating a motion for summary judgment, "[t]he evidence is to be viewed in the light most favorable to the nonmoving party and the court must draw all reasonable inferences" in that party's favor. *Talavera v. Shah*, 638 F.3d 303, 308 (D.C. Cir. 2011).

## III. ANALYSIS

Wilson brings three claims. First, she alleges that the District violated the Equal Pay Act by paying her less than her male colleagues. *See* ECF 14 ¶¶ 35–45. Second and third, that the District unlawfully retaliated against her—in violation of the Equal Pay Act and Title VII, respectively—after her "repeated complaints of wage discrimination." *Id.* ¶¶ 46–68. Although the District is right that the statute of limitations restricts the time period for which Wilson can recover on her first claim, she is right that a jury will have to resolve the claim. As for the retaliation claims, aspects of those claims survive the District's motion but others fail as a matter of law.

### A. Wilson's Equal Pay Act claim must be decided by a jury.

"The Equal Pay Act prohibits payment of unequal wages for equal work on grounds of sex, unless the difference is justified by one of four enumerated defenses: a seniority system, a merit system, a system that measures pay by quality or quantity of production, or any other factor not based on sex." *Thompson v. Sawyer*, 678 F.2d 257, 263 (D.C. Cir. 1982) (citing 29 U.S.C. § 206(d)). Wilson says a jury could conclude that the District ran afoul of that prohibition, so its

motion for summary judgment must be denied. Before the Court turns to the merits of Wilson's claim, it first addresses the District's argument that the statute of limitations bars Wilson's recovery for any alleged pay disparity that predates May 19, 2014.

**1. Wilson cannot recover based on any pay disparity before May 19, 2014.**

The statute of limitations for an Equal Pay Act claim is two years, unless the plaintiff can show "a willful violation," in which case it extends to three years. 29 U.S.C. § 255(a); *accord Laffey v. Nw. Airlines, Inc.*, 740 F.2d 1071, 1085 (D.C. Cir. 1984), *abrogated in part on other grounds by McLaughlin v. Richland Shoe Co.*, 486 U.S. 128 (1988). The District is willing to assume for the sake of argument that the three-year limitation applies here and argues only that any claims older than that—before May 19, 2014, based on the date when Wilson first filed her complaint, *see* ECF 1—are time barred, *see* ECF 49-1 at 19. Because the District has made no argument about willfulness, the Court operates on the same assumption. Applying that three-year statute of limitations, the Court holds that Wilson cannot recover for any pay disparity before May 19, 2014.

The statute of limitations starts to run when "the cause of action accrues." 29 U.S.C. § 255(a). That "ordinarily" happens "when a plaintiff has a complete and present cause of action." *SCA Hygiene Prods. Aktiebolag v. First Quality Baby Prods., LLC*, 580 U.S. 328, 337 (2017).[2] Because the "factual and legal prerequisites for filing suit [were] in place" each time Wilson was "pa[id] wages . . . at a rate less than" her male colleagues were paid "for equal work," a claim accrued upon her receipt of each paycheck, thereby starting a three-year limitations period each time she was paid. *Norwest Bank Minn. Nat'l Ass'n v. FDIC*, 312 F.3d 447, 451 (D.C. Cir. 2002)

[2] Whether this statute of limitations is subject "to a discovery rule" is not at issue in this case. *SCA Hygiene Prods. Aktiebolag*, 580 U.S. at 337.

(first quote); 29 U.S.C. § 206(d)(1) (second and third quote). Claims based on any paychecks received more than three years before she filed this lawsuit are, therefore, untimely.

Wilson tries to avoid that conclusion by invoking the continuing-violations doctrine. That doctrine applies when the violation "is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period, typically because it is only its cumulative impact (as in the case of a hostile work environment) that reveals its illegality." *Keohane v. United States*, 669 F.3d 325, 329 (D.C. Cir. 2012). The doctrine does not, however, apply to "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002). And the D.C. Circuit has held that the payment of an "allegedly discriminatory paycheck[]"—the type of violation at issue here—is a similarly discrete action. *Shea v. Rice*, 409 F.3d 448, 451 (D.C. Cir. 2005), *abrogated on other grounds by Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618 (2007).

The Court recognizes that the Supreme Court and D.C. Circuit cases just cited both dealt with Title VII claims, so interpreted the statutory language—"unlawful employment practice occurred"—that indicates when the clock starts ticking on that scheme's statute of limitations. *Morgan*, 536 U.S. at 109 (quoting 42 U.S.C. § 2000e-5(e)(1)); *Shea*, 409 F.3d at 449, 451 (applying *Morgan* in Title VII case). But if anything, the statutory language applicable to the Equal Pay Act makes it even more clear that the statute of limitations starts to run with each paycheck. Unlike an "employment practice," which could potentially "connote[] an ongoing violation," *Morgan*, 536 U.S. at 110, the Equal Pay Act's statute of limitations is triggered by a claim's "accru[al]," 29 U.S.C. § 255(a), and the conduct that creates a claim is the employer "paying

wages," *id.* § 206(d)(1). That language confirms that each "payment" of "wages" starts the statute's clock running. *Id.*

The continuing-violations doctrine is therefore inapplicable to Wilson's claims, and the statute of limitations started running each time she received a paycheck. That means she cannot recover for any paychecks received before May 19, 2014—three years before she filed her complaint. *See* ECF 1. That does not, however, bar Wilson from using evidence about events prior to that point in time "as background evidence in support of [her] timely claim[s]." *Morgan*, 536 U.S. at 113. So, for instance, Wilson is still free to point to the work performed before 2014 by Scott, the former Chief of Security, to establish that she was paid lesser wages "for equal work." 29 U.S.C. § 206(d)(1). With that in mind, the Court turns now to the merits of Wilson's timely claims.

#### 2. A reasonable jury could find that the District violated the Equal Pay Act.

"A prima facie" Equal Pay Act "claim has two elements: (1) unequal pay and (2) working in a substantially similar (*i.e.*, substantially equal) job." *Almas v. Ad Hoc LLC*, No. 24-cv-1868, 2026 WL 592227, at *3 (D.D.C. Mar. 3, 2026).[3] The plaintiff bears "the burden of proof" on these two elements. *Corning Glass Works v. Brennan*, 417 U.S. 188, 196 (1974). "Once a prima facie case has been made out, the defendant may rebut the showing of equality, or assert one of the Act's affirmative defenses." *Goodrich v. Int'l Bhd. of Elec. Workers, AFL-CIO*, 815 F.2d 1519, 1523 (D.C. Cir. 1987). If relying on one of the four affirmative defenses, it is the defendant's burden "to prove" that the defense applies. *Id.* at 1523–24.

[3] There is "a degree of confusion" about whether the second of these two elements is best thought of as two separate elements or one. *Johnson v. Wash. Metro. Area Transit Auth.*, No. 19-cv-3534, 2022 WL 4547527, at *2 n.1 (D.D.C. Sept. 29, 2022). Judge Moss's explanation of why there are only two elements is convincing to the Court, but there is no need to definitively resolve the question here. *See Savignac v. Day*, 539 F. Supp. 3d 107, 111–16 (D.D.C. 2021). The District makes no argument that turns on that issue.

To make out her case, Wilson compares herself to three of her male colleagues: Scott—the Chief of Security; Anderson—the Chief of Licensing and Charitable Games; and Galaydick—the Director of Sales. *See* ECF 50-1 at 15. It is undisputed that all three of these men were paid more than Wilson. *See* ECF 50-2 ¶¶ 16, 21, 25, 29, 33, 43, 49, 67–68. That takes care of the first element of the prima facie case. When it comes to Anderson and Scott, the District does not contest Wilson's evidentiary showing on the second element—that they performed "substantially similar" work, *Almas*, 2026 WL 592227, at *3—either. *See* ECF 49-1 at 21 ("assuming" that Wilson has made out a prima facie case "when comparing herself to Scott"); *id.* at 24–25 (asserting that after Wilson "bec[ame] responsible for licensing and charitable games" but "received no corresponding increase in salary," she was paid "less than Anderson for performing equal work"); *see also id.* at 25 n.7 (gesturing towards an argument about the prima facie case related to Anderson, but "assum[ing]" Wilson "can meet her prima facie case when comparing herself to Anderson"). As for Scott and Anderson then, the only question is whether the District is entitled to summary judgment on its "affirmative defense." *Laffey*, 567 F.2d at 448.

The District does, however, argue that no reasonable jury could conclude that Wilson and Galaydick "perform[ed] substantially equal work," so she has not made out a prima facie when comparing herself to him. ECF 49-1 at 20. As the District sees it, it is undisputed that Wilson took on only "one aspect of Galaydick's broad portfolio"—"managing licensing and charitable games"—"while the bulk of their respective portfolios remained substantially . . . distinct." ECF 51 at 8–9. The Court agrees and holds that no reasonable jury could find that Wilson's and Galaydick's jobs were "substantial[ly] equal[]." *Goodrich*, 815 F.2d at 1524; *see also Thompson*, 678 F.2d at 270–71 (describing the "factual issue" to be resolved in deciding whether two jobs met "the standard of equality to be applied" in Equal Pay Act cases).

Galaydick's job description as the Director of Sales makes clear that his role was principally focused on generating revenue for the D.C. Lottery: "help[ing]" the lottery "meet its business plan, revenue targets[,] and transfer objectives." ECF 49-27 at 2. To that end, he was tasked with "developing and promoting gaming products, management of instant games, increasing sales of existing agents, establishing new agents[,] and enhancing the agency's image." *Id.* To be sure, neither "[j]ob descriptions" nor "titles" are "decisive." *Savignac*, 539 F. Supp. 3d at 119 (quoting *Brennan v. Prince William Hosp. Corp.*, 503 F.2d 282, 288 (4th Cir. 1974)). But other undisputed evidence about Galaydick's "job performance and content," *id.* at 118, backs up that he was in a "true revenue-generating position," ECF 49-4 at 23–24. Galaydick's annual evaluation, for instance, confirms that the bulk of the "work outcomes" he was expected to deliver related to "sales and revenue goals." ECF 50-10 at 3–4. No doubt, Galaydick was also responsible for "[o]versee[ing]" the charitable games and licensing division, *id.* at 3—work that was later transferred to Wilson. But, as is again evident from his annual evaluation, that task was a relatively small aspect of his job. Within the overarching "sales and revenue goal[]" that was assigned an 80% weight on his evaluation, the licensing and charitable games division work was only one of the six delineated objectives. *Id.* at 3.

Wilson, by contrast, had no sales responsibilities, even after the licensing and charitable games work was transferred to her. *See* ECF 50-2 ¶ 64 (Wilson insisting that the role she absorbed "did not" "include[] any sales responsibilities"). So although Wilson took on one "aspect[]" of Galaydick's work, their "job[s] as a whole" differed significantly. *Goodrich*, 815 F.2d at 1524. Galaydick's "primary duties," as his title suggests, were sales related, and Wilson's were not. *Id.* Their jobs were not, therefore, "substantially equal." *Id.*; *see also, e.g.*, *Doria v. Cramer Rosenthal McGlynn, Inc.*, 942 F. Supp. 937, 942 (S.D.N.Y. 1996) (granting summary judgment for

defendants on prima facie case when "half of" woman's job responsibilities were taken over by man who was paid more than her).

That leaves Scott and Anderson as the two relevant comparators. The District seeks summary judgment vis-à-vis Wilson's comparison to these two men on the basis of its affirmative defense that the pay "differential [was] based on any other factor other than sex." 29 U.S.C. § 206(d)(1); *see* ECF 49-1 at 21–25 (relying on this defense). "[A]s the party who bears the burden of persuasion" on this affirmative defense, the District is entitled to summary judgment only if it "established the defense so clearly that no rational jury could have found to the contrary." *Beck-Wilson v. Principi*, 441 F.3d 353, 365 (6th Cir. 2006); *see also* 10A Wright & Miller Federal Practice and Procedure § 2727.1 (4th ed. 2025) (explaining that "movant" who "bears the burden of proof" can only secure summary judgment if they show "why the record is so one-sided as to rule out the prospect of the nonmovant prevailing" at trial). The District has not cleared that "high" bar here. *Beck-Wilson*, 441 F.3d at 369.

Start with Scott. The Chief of Security role Scott held was rated as a grade 13/14 position. *See* ECF 50-2 ¶ 22. Scott was classified as a grade 14, step 10 employee with an annual salary of $114,033. *See id.* ¶ 25. After Scott retired, the District replaced his role with the Senior Investigator role and classified that new role as a grade 13 position. *See id.* ¶¶ 26–27. Wilson was temporarily detailed into this new position and then awarded it full time. *See id.* ¶¶ 29–31. Wilson was given "the lowest possible salary" in this new position's salary range—designated as a grade 13, step one employee, with a salary of $74,888. *Id.* ¶ 31; *see also* ECF 49-19 at 2. And, because the position was no longer rated as a grade 13/14 position, she was blocked from reaching the salary Scott was paid when he was the Chief of Security.

The District defends this pay differential on the basis of a "combination" of three "factors other than sex: prior salary, the [Office of the Chief Financial Officer's] time-in-grade requirements, and its bona-fide job classification system." ECF 49-1 at 22. The Court has no doubt that those factors together can amount, if proven, to a "factor other than sex." 29 U.S.C. § 206(d)(1).[4] But the record does not "so clearly" establish that these were the reasons for the pay differential such that "no rational jury could" find "to the contrary." *Beck-Wilson*, 441 F.3d at 365.

It is true that Scott's salary before he applied for the Chief of Security role was considerably higher than Wilson's salary in her position before she became the Senior Investigator. *Compare* ECF 50-2 ¶ 20, *with id.* ¶ 29. But although that fact might explain offering Wilson a smaller starting salary in her new role, it does not explain why the position was regraded from a 13/14 role to a 13 role, such that Wilson would not even have the opportunity to reach Scott's pay over time. The District instead attributes that decision to its application of a "bona fide job classification system." ECF 51 at 11 (citing this as "the factor contributing to the . . . reclassification" of the role). Under that classification system, positions are graded based on nine factors, including the "knowledge required by the position," its "complexity," and its "scope and effect." ECF 49-9 at 3.

A jury could, however, conclude that the reclassification of the role was not in fact prompted by an application of the classification system. That doubt stems from the testimony of an operations manager who participated in conversations about the reclassification. That manager remembers the Lottery's then-Chief Operating Officer telling human resources that she "fe[lt]" the new Senior Investigator role "should not be a grade 14" and that human resources "accepted" that recommendation. ECF 50-6 at 15–17; *see also* ECF 40-2 ¶¶ 34, 41 (Cohen was Chief Operating

---

[4] The District flags what looks like a disagreement among the circuits about whether "prior pay" alone can "qualify as a factor other than sex." ECF 49-1 at 22–23. The District disavowed any argument that it was justifying Wilson's lower pay based on prior pay alone, so the Court need not take sides on that split here. *See* ECF 51 at 9.

Officer, before becoming interim Executive Director in April 2015). That sequence suggests human resources did not make the decision to reclassify based on an application of the nine factors to the new role's job description but instead based on the Chief Operating Officer's direction. And perhaps even more important, the operations manager testified that Wilson "continued to perform" the duties of the Chief of Security in her new role as the Senior Investigator. ECF 50-6 at 18. If a jury credits that testimony and finds that the two roles were the same in practice, that would cast doubt on the District's assertion that the classification determination resulted from the changing "needs" of the Lottery for this role. ECF 49-6 at 10.

Finally, and as the District acknowledges, the time-in-grade requirement cannot explain the reclassification. Although that requirement might explain why Wilson could not immediately be bumped up to a grade 14 when she was temporarily detailed to the Senior Investigator position, this "requirement was not the factor contributing to the . . . reclassification." ECF 51 at 11. And because the reclassification prevented Wilson from ever earning as much as Scott, a jury could find that the time-in-grade requirement was not the "factor other than sex" that explained the pay differential. 29 U.S.C. § 206(d)(1).

The story is similar when it comes to Wilson's pay differential with Anderson. The District justifies that differential—Anderson retired earning $129,592, but Wilson "received no . . . increase in salary" when she took on his work and instead stayed at her lower salary[5]—based only on the length of Anderson's tenure. *See* ECF 49-1 at 24–25. He had been with the District for 34 years when he retired, while Wilson had been there only six years. *Compare*

[5] It is not clear from the record exactly what Wilson's salary was at this point in August 2016. *See* ECF 50-2 ¶¶ 65–66 (Wilson given this new responsibility in August 2016). When Wilson started as Senior Investigator in 2011, she was earning $74,888. *See id.* ¶ 33. When she was deposed in August 2020, she was earning approximately $113,000. *See* ECF 49-11 at 11. It seems that she received at least two raises between August 2016 and August 2020, *see id.*, so she was likely earning less than $113,000 when she took on Anderson's duties.

ECF 50-2 ¶ 50, *with id.* ¶¶ 16, 65–66. In those many years, the District argues, Anderson had received "numerous step increases," and it was those increases that created the pay disparity. ECF 49-1 at 25. Anderson's increased pay, however, was not based solely on his step rating; it was also a result of his grade rating. He retired as a grade 14 employee. *See* ECF 50-2 ¶ 49. Wilson, however, remained a grade 13 employee even after she took on Anderson's duties. *See id.* ¶¶ 67–68. A jury could find, then, that the difference in tenure cannot fully explain Wilson's lower pay.

Because the record is not "so one-sided as to rule out the prospect" of a jury ruling against the District on its affirmative defenses, the Court must deny the motion for summary judgment as to the pay disparity with Scott and Anderson. 10A Wright & Miller's Federal Practice & Procedure Civ. § 2727.1 (4th ed. 2025). Although the District has, no doubt, put forward evidence from which a jury could conclude that Wilson was paid less for reasons that had nothing to do with sex, a rational jury could also find that the District has not met its burden to "prove" that fact. *Goodrich*, 815 F.2d at 1523–24. This conclusion reflects the unremarkable proposition that, "in all kinds of litigation," "where the burden of proof lies may be decisive." *Speiser v. Randall*, 357 U.S. 513, 525 (1958).

### B. A reasonable jury could find that Wilson was retaliated against, but aspects of her retaliation claims fail as a matter of law.

Wilson also brings claims for retaliation, alleging her supervisors—the interim Executive Director, Tracey Cohen, and interim Chief Operating Officer, Craig Lindsey—treated her poorly because she "complained about unequal pay for equal work." ECF 50-1 at 23; *see also* ECF 50-2 ¶¶ 41, 65 (identifying these employees' roles).[6] Wilson says that poor treatment violated

[6] Cohen returned to her role as Chief Operating Officer, vacating the interim Executive Director position, in January 2018. *See* ECF 49-12 at 5. Some of the allegedly retaliatory actions took place after that point. *See, e.g.*, ECF 50-1 at 32–33. It is unclear what Lindsey's role became after Cohen took back the Chief Operating Officer position, but before his interim elevation he was the Agency Fiscal Officer. *See* ECF 50-5 at 6–7.

the antiretaliation provisions applicable to the Equal Pay Act and Title VII. *See* ECF 14 ¶¶ 48, 68 (citing 29 U.S.C. § 215(a)(3) and 42 U.S.C. § 2000e-3). Neither party suggests that there is any material difference between the two statutes for the purposes of the District's motion for summary judgment, so the Court addresses them together.

Wilson says Cohen and Lindsey retaliated against her by "exclud[ing]" her "from meetings that were critical to the performance of her job responsibilities, "remov[ing]" her "from an executive-level email distribution list," "circulating [her] personal information" to some of the Lottery's vendors, "denying [her] necessary training opportunities," and "failing to provide [her] with performance evaluations after her complaints of unequal pay." ECF 50-1 at 6, 9–10. The District argues these claims fail because no reasonable jury could find that any of these alleged actions qualify as adverse nor that they were causally linked to Wilson's protected activity. *See* ECF 49-1 at 27–29. The Court agrees that no jury could find that several of the actions—removal from the email list, the circulation of Wilson's personal information, the supposed denial of a training opportunity, and the performance-evaluation kerfuffle—would have "dissuaded a reasonable worker from" complaining about discrimination. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006).[7] On the other hand, a jury could find that Cohen took a materially adverse action by repeatedly excluding Wilson from meetings that were relevant to her work responsibilities. And a reasonable jury could find that this exclusion was the result of Wilson's protected activity.

[7] The Supreme Court articulated the "materially adverse" standard when interpreting Title VII's antiretaliation provision. *See White*, 548 U.S. at 68. Again, Wilson has not argued that there are any differences between the legal standards for her Title VII and Equal Pay Act retaliation claims. The Court therefore does not consider that possibility. It does, however, note that both antiretaliation provisions make it unlawful to "discriminate against" an employee because of their protected activity. 29 U.S.C. § 215(a)(3); 42 U.S.C. § 2000e-3(a). There is therefore good reason to think that the Supreme Court's interpretation of what qualifies as "discriminat[ion] against" in Title VII is equally applicable to the same statutory phrase when it is used in the Equal Pay Act. *See White*, 548 U.S. at 59 (focusing on this language in Title VII).

The Court begins with the claim that survives summary judgment. Wilson has identified six specific meetings that she was excluded from after her protected activity. *See* ECF 49-2 ¶¶ 70–71, 75, 79, 81, 88; ECF 50-2 ¶¶ 70–71, 75, 79, 81, 88. She also points out that she was excluded from recurring "executive staff meetings" in this same period. ECF 50-2 ¶ 93; ECF 50-6 at 25–26. The District argues that these meetings were of limited relevance to Wilson's job and that her exclusion from them did not interfere with the performance of her work, *see* ECF 51 at 19–21, but Wilson testified to the contrary. For instance, she said that one of the meetings was "a critical priority meeting" about an "issue that [Wilson] raised" and that would "ultimately" require Wilson's "approv[al]." ECF 50-7 at 7. For another meeting—the District characterizes this gathering as a "holiday luncheon" at an MGM casino, ECF 50-2 ¶ 79—Wilson explained how attending would have increased her knowledge of relevant "security" and "licensing" issues. ECF 50-7 at 11. Wilson has also pointed to testimony from other Lottery employees that suggests the meetings were relevant to Wilson's responsibilities. *See, e.g.*, ECF 50-5 at 15–16. At this stage, then, the Court credits Wilson's account that these meetings were related to her job responsibilities.

A jury could find that repeatedly excluding an employee from meetings related to their job would "dissuade a reasonable worker from making . . . a charge of discrimination." *White*, 548 U.S. at 57; *see also Pardo-Kronemann v. Donovan*, 601 F.3d 599, 607 (D.C. Cir. 2010) (describing adverse-action element as "a jury question"). As anyone who has worked in an office can attest, being left out of meetings related to one's responsibilities can affect "professional advancement." *White*, 548 U.S. at 69. Fearing such ostracization, an employee "could well" think twice about complaining of discrimination. *Id.* at 57. And even if being excluded from a single meeting might not have been enough, the "cumulative effect" of Wilson's exclusion could allow a reasonable jury to find in her favor. *Baird v. Gotbaum*, 792 F.3d 166, 168 (D.C. Cir. 2015). A

jury could find that there was a "link[]" connecting each aspect of the retaliation Wilson experienced: Wilson suffered "the same type of employment actions"—exclusion from meetings—"relatively frequently, and . . . perpetrated by the same manager[]"—Cohen. *Baird*, 792 F.3d at 168–69; *see id.* ¶¶ 70–71, 75, 79, 81, 88, 93 (describing Cohen's role in each of these meetings). And a jury could also find that Cohen's campaign of exclusion was "pervasive[]." *Baird*, 792 F.3d at 169. If a jury views the facts as Wilson describes them, the campaign "unreasonably interfere[d] with [Wilson's] work performance." *Id.* That is sufficient to constitute an adverse action.

So too could a reasonable jury find that this campaign of exclusion was causally linked to Wilson's protected activity. On September 20, 2016, Wilson's lawyer sent a letter to the Deputy Chief Financial Officer and Chief of Staff in the office that houses the Lottery, along with that office's head of human resources, "complaining about gender and equal pay discrimination." ECF 49-2 ¶ 69; ECF 50-2 ¶ 69; *see also* ECF 50-2 ¶ 5 (identifying employee role). Seven days later, the claimed exclusion began when Wilson was left out of a meeting with Cohen and others. *See* ECF 49-2 ¶ 70; ECF 50-2 ¶ 70. That "very close" temporal link would support a jury finding that Wilson's exclusion was causally linked to her protected activity. *Clay v. Howard Univ.*, 128 F. Supp. 3d 22, 33 (D.D.C. 2015) (concluding that "period of less than two months" is "comfortably" within window that supports a causal inference); *see also Talavera*, 638 F.3d at 313 (discussing role of temporal proximity at summary judgment). The District, for its part, argues that there is no evidence "in the record [that] shows that Cohen . . . learned" about Wilson's lawyer's letter. ECF 49-1 at 28. But Wilson sent a demand letter to human resources implicating Cohen, and seven days later, Cohen started excluding Wilson from meetings. *See* ECF 49-40 at 3–4 (letter repeatedly mentioning Cohen); ECF 50-2 ¶ 70. A jury could infer from that sequence and the

content of the letter that Cohen learned about the letter and then started treating Wilson differently. *See Pinney v. Isaacman*, No. 19-cv-2259, 2026 WL 622255, at *14 (D.D.C. Mar. 5, 2026) (recognizing that "a supervisor's abrupt change in behavior shortly after service of a complaint could give rise to an inference that the supervisor was aware of the" complaint), *aff'd* Per Curiam Order, No. 26-5106 (D.C. Cir. Aug. 20, 2026).

What's more, Wilson has "positive evidence beyond mere proximity"—reasons to doubt the sincerity of the District's proffered explanation for Wilson's exclusion—to support her claim of retaliation. *Talavera*, 638 F.3d at 313. For instance, the District says that Cohen did not invite Wilson to the meeting at the MGM casino because it was for "directors" only. ECF 50-2 ¶ 79. Wilson points out, however, that she was initially invited to that meeting—even though she was not at the time a director—but when the meeting was rescheduled after her lawyer sent the letter, she was no longer invited. *See id.*; ECF 50-4 at 32. That Wilson was initially invited despite not being a director, yet excluded after her protected activity, could give a jury "reason to doubt" the District's explanation for excluding Wilson from this meeting. *McFadden v. Ballard Spahr Andrews & Ingersoll, LLP*, 611 F.3d 1, 4 (D.C. Cir. 2010). Wilson points to evidence that she says undermines the District's explanation for her exclusion from other meetings, too. *E.g.*, ECF 50-2 ¶ 72 (pointing to inconsistent testimony about the subject matter of one meeting). Should the jury "disbelie[ve]" the "reasons put forward" by the District for Wilson's exclusion, it could "infer" that the real reason Cohen started excluding Wilson was to retaliate. *Aka v. Wash. Hosp. Ctr.*, 156 F.3d 1284, 1294 (D.C. Cir. 1998). Because a jury could find that Wilson's exclusion from meetings qualified as an adverse action and resulted from her protected activity, this aspect of the retaliation claims must be decided by a jury.

The other events Wilson complains about, however, are the kinds of "trivial harms"—"petty slights or minor annoyances that often take place at work and that all employees experience"—that do not qualify as adverse actions. *White*, 548 U.S. at 68. Wilson ultimately received the additional training she sought for her and her staff, *see* ECF 50-2 ¶¶ 91–92, and she does not explain what "objectively material consequences" resulted from any delay in receiving that training, *Heavans v. Dodaro*, 648 F. Supp. 3d 1, 16 (D.D.C. 2022); *see also* ECF 50-1 at 30, 36 (asserting only in conclusory fashion, and without citation, that Wilson "provided evidence that the denial of" training "had a materially adverse effect on Ms. Wilson's ability to perform an essential function of her job"). Wilson did identify a single email she missed after she was removed from the executive email distribution list, but another colleague flagged that email for Wilson so that she could do what was needed. *See* ECF 50-7 at 22–23. And unlike the series of meetings Wilson missed, which were all "linked" and so can be assessed "cumulative[ly]," *Baird*, 792 F.3d at 168, Wilson remained on the email list for more than a year after her exclusion from the meetings began, *see* ECF 50-2 ¶¶ 70, 94 (Wilson removed from list in January 2018). That timing not only undermines Wilson's effort to show that her removal from the email list was an adverse action but also renders implausible any causal link between the protected activity and this event.

Likewise, no reasonable employee would be dissuaded from complaining because their manager signed off on the employee's positive performance review without meeting with the employee to provide additional feedback. *See* ECF 49-56 at 2 (Wilson rating own performance as "exceeds expectations"); ECF 49-55 at 2 (Lindsey telling Wilson he "concur[s]" with what she "stated" and her "associated rating" and has "no amendments to the evaluation"). The same goes for Cohen accidentally emailing Wilson's performance plan to some vendors. After that happened, Cohen promptly followed up and told the vendors to "discard both the email and its attachments

immediately." ECF 49-54 at 2. Because these allegedly adverse actions amount, at most, to "petty slights, minor annoyances, and [a] simple lack of good manners," they cannot support a retaliation claim. *White*, 548 U.S. at 68.

* * *

The District's motion for summary judgment, ECF 49, is **GRANTED in part** and **DENIED in part**.

**SO ORDERED.**

JIA M. COBB
United States District Judge

Date: September 4, 2026